**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

GERALD J. ADAMS,                          )
                                          )
              Plaintiff,                  )    No. 03:12-cv-00829-HU
                                          )
vs.                                       )
                                          )
CAROLYN W. COLVIN[1],                     )**FINDINGS & RECOMMENDATION**
Commissioner of Social Security,          )
                                          )
              Defendant.                  )

_____

Max Rae
P.O. Box 7790
Salem, OR 97303

       Attorney for Plaintiff


S. Amanda Marshall
United States Attorney
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2904


David Morado
Regional Chief Counsel, Region X, Seattle
Christopher J. Brackett
Lisa Goldoftas
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite #2900 M/S 221A
Seattle, WA  98104-7075

       Attorneys for Defendant

---

[1]Carolyn W. Colvin became acting Commissioner of Social Security on February 24, 2013.  Therefore, pursuant to Federal Rule of Civil Procedure 25(d), she is automatically substituted for Michael J. Astrue as Defendant in this case.

1  HUBEL, United States Magistrate Judge:

2      The plaintiff Gerald J. Adams seeks judicial review, pursuant

3  to 42 U.S.C. § 405(g), of the Commissioner's final decision denying

4  his application for Supplemental Security Income under Title XVI of

5  the Social Security Act, 42 U.S.C. § 1381 *et seq*. Adams argues the

6  Administrative Law Judge ("ALJ") erred in failing to find him

7  disabled under Listing 12.05C, improperly evaluating the evidence,

8  and finding Adams is functionally able to work. *See* Dkt. ## 19 &

9  22.  In addition, Adams argues the ALJ erred in failing to

10  adjudicate a prior application for benefits. *Id.*

11

12              *I.  PROCEDURAL BACKGROUND*

13      Adams protectively filed his application for SSI benefits on

14  March 12, 2008, at age 42, claiming disability since March 31,

15  2007, due to "[p]aint poisoning, carpal tunnel, worse in left hand,

16  memory loss, learning disability, [and] anger problem." (A.R. 21,

17  113-18, 129[2])  Adams's application was denied initially and on

18  reconsideration.  (A.R. 76-80, 82-84)  Adams requested a hearing,

19  and a hearing was held on August 3, 2010, before an ALJ.  Adams was

20  represented by an attorney at the hearing.  Witnesses at the

21  hearing included Adams, his wife Stephanie Jolee Adams, and a

22

23      [2]The administrative record ("A.R.") was filed electronically
24  using the court's CM/ECF system.  Dkt. #13 and attachments.  Pages
   of the A.R. contain at least three separate page numbers: two
25  located at the top of the page, consisting of the CM/ECF number
   (e.g., Dkt. #13-3, Page 23 of 74) and a Page ID#; and a page number
26  located at the lower right corner of the page, representing the
   numbering inserted by the Agency.  Some pages also contain a page
27  number inserted by the office supplying the records.  Citations
   herein to "A.R." refer to the agency numbering in the lower right
28  corner of each page.

                         -2-

1  Vocational Expert ("VE").  (A.R. 36-73)  On September 3, 2010, the
2  ALJ issued his decision, denying Adams's application for SSI
3  benefits.  (A.R. 17-31)  Adams appealed the ALJ's decision, and on
4  March 30, 2012, the Appeals Council denied his request for review
5  (A.R. 1-5), making the ALJ's decision the final decision of the
6  Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.  Adams filed a
7  timely Complaint in this court seeking judicial review of the Com-
8  missioner's final decision denying his application for SSI bene-
9  fits.  Dkt. #1.  The matter is fully briefed, and the undersigned
10 submits the following findings and recommended disposition of the
11 case pursuant to 28 U.S.C. § 636(b)(1)(B).

12

13                      **II.  FACTUAL BACKGROUND**

14              **A.  Summary of Relevant Medical Evidence**

15      The record indicates Adams is 5'5" tall.  His weight has
16 varied significantly during the period represented in the medical
17 evidence.  For example, records indicate he weighed 142 pounds on
18 January 17, 2006 (A.R. 303); 162 pounds on December 31, 2007 (A.R.
19 326); 173 pounds on October 1, 2008; 161.4 pounds on June 5, 2009
20 (A.R. 394); 145 pounds on October 27, 2010 (A.R. 417); and 140.2
21 pounds on July 26, 2011 (A.R. 459).

22      On December 31, 2007, Adams saw Nurse Practitioner Jason M.
23 Bischoff ("NP Bischoff") at the Chemawa Health Center, for
24 "[e]valuation and Management of Head Aches, [restless leg syn-
25 drome], and [medication] refills."  (A.R. 326)  Adams complained of
26 an "intense urge to move [his] legs" that was worse when he was
27 lying in bed.  (*Id.*)  He stated his symptoms would resolve when he
28 got up and walked around, but then return when he went back to bed.

1  He also described an "occasional sensation of 'creepy/crawly'"
2  (*Id.*)  Adams also complained of ongoing daily headaches, for which
3  he was taking Indocin.  NP Bischoff increased Adams's Atenolol
4  dosage for his blood pressure.  He prescribed Neurontin for
5  headaches and restless leg syndrome, and renewed a prescription for
6  Flexeril (a muscle relaxer).  He also noted, "Consider mental
7  health counseling/meds to aid w/chronic pain."  (A.R. 326)  In
8  addition, Adams was given an injection of Toradol.  (A.R. 328)[3]

9      On April 28, 2008, Adams saw NP Bischoff for followup of his
10 headaches, joint pain, and restless leg syndrome, and discussion
11 about possibly changing his medications.  Adams's affect was
12 "[f]rustrated and angry."  (A.R. 323)  He stated Indocin and
13 Flexeril had not helped his pain at all, and the Indocin had caused
14 stomach pain.  Neurontin had helped his restless leg syndrome at
15 first, but then his symptoms had returned.  Notes also indicate
16 Adams was wearing bilateral wrist braces.  In addition, his blood
17 pressure remained high.  NP Bischoff increased Adams's Atenolol
18 dosage for his blood pressure.  He directed Adams to titrate up the
19 Neurontin to 600 mg. three times daily, as needed to control his
20 restless leg symptoms.  Adams was started on Ultram 50 mg. at
21 bedtime for pain, and Indocin and Flexeril were discontinued
22 because they were not helping Adams's symptoms.  (A.R. 323-24)

23     On May 2, 2008, Adams saw Nick Dietlein, Psy.D. for an "IQ
24 evaluation at the request of Oregon Disability Determination

---

26     [3]The record also contains a treatment note from August 18,
   2006, when Adams was treated for a back strain.  (*See* A.R. 306)
27 That record, and the treatment note from December 31, 2007, are the
   only medical evidence of record predating Adams's March 12, 2008,
28 application for SSI benefits.

-4-

Services." (A.R. 308)  When Dr. Dietlein asked Adams if he under-stood why he was being evaluated, Adams responded, "I have a lot of mental problems going on right now.  I had a learning disability many years ago.  It is hard to find work when you do not have a high school diploma or the skills.  I have spent most of my life doing drugs and have been in and out of prison."  (*Id.*)

Adams stated he finished the sixth grade in school, and had some schooling during his incarceration.  He indicated he "was identified with learning problems," but he was unable to provide any detail concerning the nature of those "learning problems." (*Id.*)  Adams provided little work history.  The doctor noted Adams's "last job was through a temporary service in Susanville, California," where Adams "was exposed to heavy paints and . . . had a law suit going on there." (*Id.*)  He stated this "paint exposure" was "part of [his] illness now." (*Id.*)  He also reported problems with carpal tunnel syndrome in both wrists, and frequent headaches. He was taking Atenolol for high blood pressure, and some type of medication for pain.  (A.R. 308-09)

Adams stated he was not using drugs currently, with his last use of marijuana occurring "last year," and his last use of alcohol occurring thirteen years earlier.  He used methamphetamine from age 15 to age 19.  He is a long-term smoker, smoking about one pack of cigarettes a day.  (A.R. 309; *see* A.R. 305)

Adams reported "significant problems with his sleep because of problems with pain."  (A.R. 309)  He usually went to bed around 12:30 to 1:00 a.m., and got up around 8:00 a.m.  He had no problems with his appetite, stating he had gone from 110 pounds the previous year to 175 pounds at the time of this interview.  He indicated the

weight gain had caused him to "feel a lot better." (*Id.*)    He described problems with his memory and concentration, noting he could relate what he had done that day, but he would have difficulty recalling what he did a few days ago. (*Id.*)

The doctor noted the following regarding Adams's mental state:

> While denying any depression Mr. Adams reports that his depression today is a 6/7 on a scale of 0-10. He also reports experiencing a 6/7 on an anxiety scale. He states, "I am always kind of nervous. I don't sit down too much. I am always on the move." Mr. Adams denies current or historical thoughts of suicidal or homicidal ideation. Mr. Adams states, "I try to stay upbeat. I have thought about the chemical exposure and that bothers me a lot. The paint we were using was for military vehicles and it reportedly had stuff for biological warfare in it. Doctors have told me that it will lead to a full body shutdown.
>
> Mr. Adams reports that he often worries about bad things that could happen and has trouble stopping his worry. He frequently feels grouchy, cranky, and irritable. He frequently feels tense and is unable to relax. He worries about doing things (such as eating or speaking) in front of other people. He often prefers to be alone rather than with family or friends. He reportedly often does not feel like doing anything and feels bad about things that he has done in the past. Mr. Adams reports he often has trouble following verbal instructions, has trouble getting organized, avoids doing things that require concentration and is easily distracted by events going on around him. He describes himself as forgetful, fidgety, has trouble sitting still, and is always on the go. Mr. Adams reports that he often loses his temper, is argumentative, and is easily annoyed by other people. He reportedly has sudden mood swings where he becomes very depressed or irritable.

(*Id.*)

Adams described his daily activities, stating he gets up at 8:00 a.m., makes coffee, smokes a cigarette, and then watches television "all day long." (*Id.*)  He does not eat breakfast, eats

1   lunch sometime in the afternoon, and only eats dinner "every other
2   day." (*Id.*) If his wrists are not hurting too much, he might
3   vacuum or mow the yard. He showers every other day. He used to
4   enjoy bowling and riding a bike, but now he has no hobbies or
5   activities. "His three favorite activities are watching TV, being
6   with his wife and smoking his cigarettes." (A.R. 310) Adams
7   stated he "can sit for 15-30 minutes, stand for half an hour, and
8   walk 2-3 miles without tiring." (A.R. 309) He receives $155 a
9   month in food stamps, and has no other income. He does not do any
10  grocery shopping. He can use a telephone, but has problems using
11  a phonebook. (A.R. 309-10)

12      Regarding Adams's mental status exam, the doctor noted Adams
13  "appeared to be anxious throughout [the] interview." (A.R. 310)
14  Adams offered little spontaneous information about himself, and did
15  not talk much, although he was "generally friendly and appeared to
16  be a willing participant in the interview." (*Id.*) Adams was
17  "unable to name the current Governor of Oregon and was unable to
18  name the last three presidents of the United States." (*Id.*) He
19  had mostly indirect eye contact; no apparent disturbance of motor
20  function or agitation; and walked with a normal gait and posture.

21      Dr Dietlein administered the Wechsler Adult Intelligence
22  Scale-Third Edition (WAIS-III), "to obtain a snapshot of [Adams's]
23  general cognitive abilities." (*Id.*) He noted Adams "appeared to
24  put a good effort forth" on the test. (*Id.*) The test yielded a
25  Verbal IQ of 64, Performance IQ of 69, and Full Scale IQ of 63, all
26  three of which were deemed "Extremely Low." (*Id.*) "His overall
27  thinking and reasoning abilities exceed those of approximately 1%
28  of adults his age." (*Id.*) The test results further indicated

-7-

Adams has "significant problems" with his "ability to attend to verbally presented information, to process information in memory and then to formulate a response." (A.R. 311) He "had significant problems performing basic mental arithmetic," and he exhibited an "inadequate" ability to think abstractly. (*Id.*)

Dr. Dietlein noted the following conclusions (among others):

> With Mr. Adams'[s] current poor cognitive functioning in mind, it is unclear whether Mr. Adams is suffering from a learning disability. Based on today's assessment findings, it is plausible that Mr. Adams may have had ADHD as a child with tandem learning disabilities. His cognitive limitations in tandem with his reported chemical exposure may have compromised what may have been previous poor cognitive functioning.

> Today's evaluation revealed that Mr. Adams had difficulty understanding and remembering instructions. He had problems sustaining his concentration and attention and will likely find tasks that require these abilities very difficult. Mr. Adams gave evidence of being able to persist in what was asked of him. He was also clearly able to engage in social interactions successfully. I believe Mr. Adams would be able to manage any funds that might be given to him.

(A.R. 313)

On May 20, 2008, Adams saw NP Bischoff to get started on Prozac. Adams reported "[f]eeling angry and down all the time due to persistent [headache] pain." (A.R. 321) Adams's wife stated Adams had frequent "angry outbursts [and] restless sleep." (*Id.*) NP Bischoff noted Adams's affect was "sullen." (*Id.*) Because Adams's headaches were now "constant," and his various joint pains had increased in intensity, NP Bischoff advised Adams that he should see a neurologist, and Adams and his wife "need[ed] to find a way to afford doing that since [Adams's] quality of living has

1  steadily decreased over the past year." (*Id.*)  Adams declined a
2  referral to a neurologist at this time. (*Id.*)

3      Adams saw NP Bischoff on June 2, 2008, for followup of his
4  Prozac trial, and to discuss his ongoing headaches.  Adams stated
5  he thought he was feeling some positive results from the Prozac,
6  but his wife was "doubtful at this time." (A.R. 381)  Adams
7  continued to have headaches at 6-10/10 in intensity, now disrupting
8  his sleep at times, but no new neurological changes.  He was
9  frustrated with his "constant pain."  His Neurontin was increased
10 from 1500 mg. to 1800 mg. daily to address continued restless leg
11 problems.  Percocet was prescribed for his chronic pain symptoms,
12 but Adams was "[w]arned" that the dosage would not be increased in
13 the near future. (*Id.*)

14     On July 3, 2008, Adams saw NP Bischoff for followup of his
15 "chronic medical conditions." (A.R. 379)  Adams's pain was fluc-
16 tuating, but was relatively stable on Percocet.  His restless leg
17 syndrome was stable on Neurontin, and he had no new neurological
18 symptoms or problems.  His medications were continued without
19 change. (*Id.*)

20     On July 9, 2008, a disability investigator authored a Report
21 of Investigation regarding an investigation into Adams's disability
22 claim. (A.R. 333-40)  The report indicates an investigation was
23 requested on May 15, 2008, because Adams was "suspected of feigning
24 his disability for secondary gain." (A.R. 335)  Notes indicate
25 Adams had "a history of carpal tunnel for several years, right
26 greater than left.  He is right-handed and does manual labor,
27 working in a junk yard." (A.R. 336)  His carpal tunnel diagnosis
28 had been confirmed by positive Phalen's and Tinel's signs. (*Id.*)

The investigator went to Adams's residence on June 26, 2008, to interview Adams. (It appears Adams did not know the investigator was coming. *See* A.R. 337) When he encountered Adams, Adams was wearing braces on both wrists. The investigator noted that Adams's girlfriend attempted to answer each question put to Adams, but the investigator ignored her and attempted to elicit responses from Adams.[4]   The investigator noted the following observations of Adams:

> ADAMS actually presented as sober, alert, fully oriented to person(s), place, topics discussed, and had good memory recall. He was talkative, personable, socially appropriate, and even stopped conversation to correct a small child on two different occasions. His speech, although not always grammatically correct, was fluent, linear, and he demon-strated a good vocabulary. He gave the impression of someone that was perhaps unedu-cated but not retarded or lacking in cognitive functioning.
>
> \*   \*   \*
>
> Cognitively speaking, ADAMS presented as functional. He is perhaps uneducated but cer-tainly able to make his needs known to others and had goal directed thoughts and speech. He had no trouble tracking the conversation with the investigator and was able to forecast probable results when discussing criminal behavior on the part of others. He was quick to point out to the investigator that he had been clean and sober for over a year, had not been in trouble with law enforcement, and had not been driving because he was aware his license was suspended. He had good recall, both short and long-term, demonstrated by his recall of DMV visits, prior incarcerations,

---

[4]The record sometimes refers to Adams's "girlfriend," and sometimes to his "wife." Both appear to be the same person - Stephanie Adams. Adams and his wife were married from 1986 to sometime in 1991, when they divorced. They got back together and remarried sometime in 2007. (*See* A.R. 56-57)

his Siletz Indian heritage and benefits, and recent shopping trips to Salem Center mall.

Physically, ADAMS was able to stand and talk to the investigator for roughly forty minutes, walk without aid or assistive devices, crouch to his knees, bend at the hips, and use his neck, shoulders, arms, and hands in a normal fashion.  As mentioned before, he was wearing two wrist braces and claimed he was scheduled for carpal tunnel surgery.  He also informed the investigator that he was "terminal" and expected to die fairly soon.  He stated that he'd been exposed to toxic paint fumes in California several years ago, and the doctors had told him he'd probably be dead in ten years.  Although he never tried to explain his wrist injury, he proclaimed that he was unable to work and had applied to SSA for disability. A short time later, when talking about his internet usage, he revealed that he had recently applied for several local jobs via the internet, including a nearby Oil Can Henry's and a car lot.

At the conclusion of the interview, the investigator asked ADAMS to view several plastic sleeves of photographs in an effort to identify someone.  He was handed five separate sheets of plastic, and had no trouble grasping, shuffling, or manipulating them to view each sheet separately.  Following another strong-gripped handshake at the end of the interview, the investigator departed.

(A.R. 338-39)

During the interview, Adams produced an envelope of papers he had received from the Social Security office.  One paper listed his employment history.  Adams had written "Not Mine" next to a couple of entries, which he showed to the investigator, stating he had never worked for those companies.  The investigator noted Adams had gone through the list, "turn[ing] the pages and . . . reading the addresses aloud. . . .  He was able to read the company names and addresses without difficulty.  He also had no problems holding the

-11-

1  papers in his hands and manipulating the pages as he turned them."
2  (A.R. 338)

3      On July 23, 2008, Physical Medicine and Rehabilitation spe-
4  cialist Linda L. Jensen, M.D. reviewed the record and completed a
5  "Physical Summary" regarding Adams.  She noted Adams claimed he
6  could not grip a cup, but "spends his day watching TV, drinking
7  coffee and his grip was intact as observed by investigators."
8  (A.R. 341)   She noted Adams's appearance at the consultative
9  evaluation by Dr. Dietlein "was significantly different from that
10 observed by investigators where [Adams was] more interactive and
11 able to read." (*Id.*)  In addition, although Adams claimed daily
12 headaches, he had declined his doctor's offer of a referral to a
13 specialist, and he "did not report problem with headaches at [the
14 consultative evaluation] or with investigators." (*Id.*)  Dr. Jensen
15 also noted Adams's report that he had applied for several jobs was
16 inconsistent with his claim that he is disabled and only able to
17 perform minimal daily activities.   For these reasons, she found
18 Adams's statements about his functional abilities "not credible."
19 (*Id.*)

20     On July 30, 2008, psychologist Dorothy Anderson Ph.D. reviewed
21 the record, and completed a Psychiatric Review Technique form (A.R.
22 347-60), and a Mental Residual Functional Capacity Assessment form
23 (A.R. 361-63) regarding Adams.   She found that Adams has an
24 unspecified cognitive disorder, and a dysthymic disorder, causing
25 moderate difficulties in Adams's ability to maintain concentration,
26 persistence, or pace; mild restriction in his activities of daily
27 living; no difficulties in maintaining social functioning; and no
28 episodes of extended decompensation. (A.R. 347-57)  Dr. Anderson

found that Adams's "cognitive [disorder] NOS and dysthymia . . .
limit[] his ability to complete detailed or complex tasks," but
Adams is "[n]ot limited in his ability to complete simple, routine
tasks."  (A.R. 359)

Regarding Adams's specific functional limitations, Dr. Ander-
son indicated Adams would be moderately limited in the ability to
understand, remember, and carry out detail instructions; interact
appropriately with the general public; and set realistic goals or
make plans independently of others; but he would not be
significantly limited in any other work-related mental functional
ability.  (A.R. 361-63)

On October 1, 2008, Adams saw NP Bischoff for followup of his
carpal tunnel syndrome, and complaints of "chronic low back pain
and chronic headaches."  (A.R. 374)  Adams complained of photo-
phobia with the headaches.  He stated if he could sleep, the
headaches often were relieved.  He reported trying to cut down on
smoking and reduce his caffeine intake.  Adams hoped to get his
carpal tunnel problem treated once he was approved for the Oregon
Health Plan.  He was using splints on both wrists "all day and
night with limited benefit."  (*Id.*)  His blood pressure also
remained high despite medication.  His medications were continued;
notes indicate he was taking Atenolol, Prozac, Neurontin, and
Oxycodone daily. (A.R. 374-76)  Hydrochlorothiazide was added to
his medication regimen for blood pressure control.  (A.R. 376)

On December 5, 2008, Adams saw family practitioner Roger H.
Applegate, M.D. at the Chemawa Health Center with a complaint of
worsening headaches. Notes indicate Adams had a "[l]ong, compli-
cated [history] of headaches; now occurring daily, mostly in back

-13-

1  of head w/radiation to forehead ('mohawk' distribution).  Usually
2  start in early afternoon and continue on until bedtime[;] sometimes
3  start first thing in a.m.   Pain described as sometimes steady,
4  sometimes throbbing, intensity 8-10." (A.R. 372)  Adams had tried
5  Excedrin, Flexeril, Tramadol, and Tylenol #3, all without relief.
6  He currently was prescribed one Percocet daily, and stated this
7  worked at first, but now he had to take two pills at a time to get
8  relief from the pain.   He had "taken 30 tabs in 11 days."
9  (*Id.*)   Adams also complained of ongoing carpal tunnel syndrome
10 which had "plagued him" for years.  He had been awaiting approval
11 for surgery, and notes indicate Adams had "just now became eligible
12 for [the Oregon Health Plan]."  (*Id.*)   The doctor explained to
13 Adams that his headaches had an "analgesic rebound" component, and
14 Adams might eventually have to withdraw from all pain medications.
15 He gave Adams an "early" refill of his Percocet, but indicated he
16 would not authorize further refills.   He also started Adams on
17 amitriptyline.   Adams was referred to orthopedics for his carpal
18 tunnel syndrome.  (*Id.*)

19      Sometime in December 2008, NP Bischoff wrote the following
20 statement regarding Adams's condition and treatment[5]:

21          Mr. Gerald Adams is under the care of the
            Chemawa Indian Health Service Clinic. He cur-
22          rently suffers from multiple neurological pain
            processes that prevent him from prolonged
23          physical activity.   A Clinical Psychologist
            has also evaluated him with findings support-
24          ing Mr. Adams['s] inability to hold gainful
            employment at this time. Finally Mr. Adams is
25          on several medications that can impair func-

26

27      [5]The statement itself is undated, but the medical records
   transmitted with the statement encompass treatment notes from
28 June 2, 2008, through December 5, 2008. (*See* A.R. 371-83)

-14-

1          tioning in a work setting.  The progression of
2          his medical conditions is unclear and not
           expected to improve within the foreseeable
3          future.

4  (A.R. 371)

5      On December 15, 2008, psychologist Kordell N. Kennemer, Psy.D.

6  reviewed the record and completed a "Mental Summary" in connection

7  with Adams's request for reconsideration of his disability

8  application.  Dr. Kennemer concurred with Dr. Anderson's July 2008

9  findings.  (A.R. 383)

10     On December 16, 2008, family practitioner Richard Alley, M.D.

11 reviewed the record and prepared a "Physical Summary," concurring

12 with Dr. Jensen's previous opinion.  Dr. Alley gave NP Bischoff's

13 opinion letter no weight because it was undated, and was

14 inconsistent with the medical evidence of record.  (A.R. 384)

15     Adams saw NP Bischoff on January 14, 2009, for followup of his

16 headaches and carpal tunnel symptoms.  Adams reported no

17 significant changes in his headache pattern or pain.  He had

18 reduced his caffeine intake to two cups of coffee per day, cut down

19 on his smoking, and was watching his diet.  Nevertheless, he

20 continued to have daily headaches that sometimes disrupted his

21 sleep.  He was taking two Percocet at bedtime with limited results.

22 He stated his carpal tunnel symptoms were better when he used

23 braces on his wrists, but otherwise his wrists were painful with

24 even moderate use.  Adams now was on the Oregon Health Plan, so he

25 was referred to a neurologist for his headaches.  He was switched to

26 a long-acting oxycontin medication for pain, and was directed to

27 leave a message at the clinic in two weeks regarding its

28 effectiveness.  His blood pressure was up, and Lisinopril was added

-15-

1  to his medications for better blood pressure control.  (A.R. 396-
2  97)

3      On April 13, 2009, Adams saw rehabilitation specialist John
4  French, M.D. for a nerve conduction study in connection with
5  Adams's complaints of carpal tunnel pain.  The nerve conduction
6  study was normal bilaterally, and he had a normal EMG of his right
7  upper extremity and right cervical paraspinals.  (A.R. 411-12)  The
8  doctor found "no evidence of a peripheral entrapment neuropathy,
9  polyneuropathy, plexopathy, no right arm evidence of an acute or
10 chronic radiculopathy."  (A.R. 412)

11     On June 5, 2009, Adams saw NP Bischoff for routine followup of
12 his chronic pain issues.  Adams reported doing well overall, noting
13 his pain had improved somewhat since his last visit.  He no longer
14 needed to wear the braces on his wrists; his headaches were less
15 intense; and he was "having periods almost pain free."  (A.R. 394)
16 Adams stated he had been without pain medications for two weeks and
17 had experienced some withdrawal symptoms, but no pain spikes.  He
18 was "[e]ncouraged by . . . negative head CT and peripheral nerve
19 conduction studies last winter."  (*Id.*)  Adams's urine drug screen
20 was positive for marijuana, and he was told that he would have to
21 have drug screens prior to each followup visit for a few months.
22 If he had another positive screen, then he would "be withdrawn from
23 opiod [sic] use at this clinic."  (A.R. 395)  Adams stated it "was
24 just an experiment to try and [treat] the pain," and he was "not
25 worried about [the] next UA."  (A.R. 395)  His medications were
26 continued without change.  (*Id.*)

27     Adams saw NP Bischoff for followup on August 27, 2009.  Adams
28 stated oxycontin had been ineffective in controlling his pain, and

-16-

1  he had "been out for several weeks now anyway." (A.R. 392)  His
2  urine drug screen remained positive for  marijuana, and Adams
3  stated he preferred to use the marijuana for pain rather than
4  medication.   Adams's wife voiced a concern that Adams's
5  anger/volatility had increased, and NP Bischoff increased Adams's
6  Prozac dosage from 40 mg. to 60 mg. daily.  Adams was continued on
7  2700 mg. daily of Neurontin for restless leg syndrome, as well as
8  amitriptyline 10 mg. at bedtime, and his blood pressure medications
9  and antacids.  (A.R. 392-93)

10       The record evidence indicates that more than six months passed
11  before Adams sought further medical treatment.  On March 12, 2010,
12  Adams saw Nurse Practitioner Ruth A. Thomas ("NP Thomas") at the
13  Liberty Street Clinic to establish care.  Adams again reported that
14  he had been "exposed to toxic paint" in about 2000, and he had been
15  told he only had ten years to live before he would go "into total
16  organ failure." (A.R. 401)  Adams stated he had been "sent to
17  paint vehicles for the military without protective gear.  Later [he
18  was] told the paint was a biochemical weapon." (*Id.*)  Adams stated
19  his worst problems currently were "[d]ebilitating headaches, toxic
20  neuropathy, and severe pain." (*Id.*)  He stated his pain from the
21  "toxins" was nearly constant and severe.  (*Id.*)  He reported
22  drinking "2 pots of coffee daily and smok[ing] up to 1 pack of
23  cigarettes." (*Id.*)  Adams also complained of chronic depression
24  with symptoms of "anhedonia, fragmented sleep, feeling not good
25  enough and sadness." (*Id.*)  NP Thomas reduced Adams's Prozac
26  dosage and started him on Cymbalta 30 mg. daily.  She increased his
27  Neurontin to 3600 mg. daily for chronic "Neuropathy, toxic," and
28  added Mirapex 1 mg. three times daily, and Elavil 50 mg. at bed-

time.  She continued his blood pressure medications without change,
and prescribed Percocet 7.5/500 mg., one tablet every six to eight
hours as needed for pain.  (A.R. 403)

Adams saw NP Thomas for followup on April 22, 2010.  Adams
indicated he was "[h]appy with his current treatment plan but [was]
experiencing an exacerbation of his old chronic back pain."  (A.R.
405)  His other chronic pain issues continued, as well.  Notes
indicate Adams was "keeping appointments, exercising regularly and
taking medications regularly."  (*Id.*)  His medications were
refilled, with new prescriptions for Ibuprofen 800 mg. every eight
hours, Robaxin (a muscle relaxer) 150 mg. twice daily, and Prilosec
for GERD.  (A.R. 406-07)

Adams saw NP Thomas on October 27, 2010, for followup of hip
pain, and a complaint of a possible broken toe.  Adams stated he
had attended a friend's funeral in Nevada, and his hip joint pain
"was better there," but his symptoms had returned after returning,
and he had been "lying in bed with his left hip 'frozen up.'"
(A.R. 416)  He had been "[u]nable to move accompanied by exquisite
pain."  (*Id.*)  Although his symptoms had improved somewhat by the
time of this examination, he stated "the stiffening of the joi[n]t
can happen any time and does so sud[d]enly."  (*Id.*)  An x-ray of
his hip was ordered.  In addition, Adams stated he had "[d]ropped
an outboard boat motor on his left foot crushing his great toe."
(*Id.*)  The toe had been very swollen, but there was no discolora-
tion, and his range of motion was improving.  No treatment was
ordered for his toe.  (*Id.*)  The record indicates the x-ray exam of
Adams's left hip was "completed" (*see* A.R. 418), but no report
appears in the record.

-18-

1   On April 6, 2011, Adams saw NP Thomas for followup.  Adams
2  stated "his chronic back pain [was] fairly well controlled." (A.R.
3  419)  He was managing most of his activities of daily living
4  "without difficulty," and was not experiencing any side effects
5  from his medications. (*Id.*)  He had begun having pain in his right
6  elbow, centered over the right lateral epicondyle.  The pain
7  increased with movement, and improved somewhat with stabilization.
8  NP Thomas recommended a "small velcro band to be placed on [the]
9  arm about 2 inches distal to the elbow." (*Id.*)  Adams stated he
10 had tried to see a mental health doctor or counselor at West Salem
11 Clinic, but was "told there were no openings." (*Id.*)  According to
12 Adams, he had been told he might be able to get in to see someone
13 if he had a referral from his primary care physician.  NP Thomas
14 noted Adams was positive for anhedonia, anxiety, feelings of
15 hopelessness, mood swings, poor insight, pressured speech, and
16 anger issues. (A.R. 420)  She initiated a referral for Adams to
17 the mental health clinic. (A.R. 419)

18   On June 1, 2011, Adams saw NP Thomas for followup.  Adams was
19 "hoping for some kind of surgical repair for his back pain." (A.R.
20 422)  A bone scan of his right low back was ordered. (*Id.*)  The
21 bone scan was done on June 2, 2011, and showed "scoliosis of the
22 mid lumbar spine to the left as well as focally increased uptake of
23 radiopharmaceutical over the mid lumbar spine on the concave right
24 side," specifically "over the facet joints bilaterally at the L5-S1
25 level, left greater than right, and over the expected L3-4 facet
26 joint on the right." (A.R. 439)

27   On July 6, 2011, Adams saw psychiatrist Joel Suckow, M.D. at
28 Northwest Human Services, West Salem Mental Health, for a psy-

-19-

chiatric consultation, "diagnostic clarification and medication recommendations." (A.R. 447; *see* A.R. 447-53) Adams's wife accompanied him, and was present throughout the evaluation. (*Id.*) Dr. Suckow found Adams's behavior to be unremarkable, and his affect to be "appropriate and full and congruent w/stream of thought." (A.R. 450) No psychomotor behaviors were present, and Adams sat "relaxed throughout" the interview. (*Id.*) His mood was "labile, anxious, irritable and depressed." (A.R. 451) He had fair judgment and poor insight. The doctor noted, "Most evident is interpersonal dynamics between [Adams] and his wife, which obviously will not be treatable w/a psych med per se." (*Id.*) He found Adams's symptoms to be most consistent with a generalized anxiety disorder and dysthymia, based on Adams's reported history. (*Id.*) He started Adams on a trial of a "low/moderate dose of Risperdal," to target Adams's symptoms of "irritability, paranoia, and behavioral (primarily verbal) outbursts, as well as mood lability." (*Id.*) The doctor expressed doubt that Adams would achieve 100% remission of his core symptoms. He referred Adams for further mental health services. (*Id.*)

Adams saw NP Thomas on July 18, 2011, for followup of a "right wrist" fracture. Adams stated he had fallen while riding his wife's bicycle on July 13 or 14, landing on his "left outstretched wrist. Diagnosed with fracture of the left arm at ER."[6] (A.R.

---

[6]There is no explanation for the discrepancies in this treatment note, which initially refers to a "right wrist" fracture, but then refers to a "fracture of the left arm" and a "Left hand . . . forearm/wrist" fracture. (A.R. 426, 427). All other treatment notes, x-rays, and the like, refer to a fracture of the right wrist.

426)  Adams's wrist was in a "splint with soft wrapping and arm
sling."  (*Id.*)  Adams had not been icing as directed, but stated he
would begin that day, and continue keeping his wrist elevated.  He
was referred to an orthopedist.  (*Id.*)

Adams saw Orthopedic Physician's Assistant Melissa R. Coombs
("PA Coombs") at Hope Orthopedics of Oregon on July 26, 2011.
Notes indicate Adams had fallen off a bike on July 13, 2011,
"resulting in a right distal radial fracture.  He was seen at the
ER and placed into a splint.  He states that he has some pain but
the pain medicine that the ER gave him is working well.  Pain scale
3/10."  (A.R. 458)  Adams's right wrist exhibited mild to moderate
swelling.  He had "maximum tenderness" of his right wrist, with his
wrist range of motion limited by pain.  X-rays were reviewed, and
the decision was made to treat the fracture "in a closed fashion,"
with a soft cast.  He was directed to elevate his wrist and use ice
as needed, and to return in four weeks for removal of the cast.
(A.R. 458-59)  Notes from another provider indicate Adams never
returned for removal of his cast, removing the cast early himself.
(*See* A.R. 433)

On December 23, 2011, Adams saw Nurse Practitioner Michelle
Lane ("NP Lane") at the Liberty Street Clinic for followup of his
high blood pressure, and chronic low back pain "due to spondylosis
and [degenerative disc disease]."  (A.R. 430)  He also complained
of a headache.  (A.R. 431)  Adams stated his back pain was under
control on his prescription for oxycodone 15 mg., four tablets per
day as needed.  (A.R. 430)  His medications were refilled.  (A.R.
432)

Adams saw NP Lane on February 6, 2012, for a complaint of right wrist pain. Notes indicate Adams had fractured his wrist the previous summer, but he had removed his cast early, and had not gone back to the orthopedic specialist for followup. His wrist was "aching, more painful recently." (A.R. 433) Adams reported "shoveling manure and caus[ing] increased pain." (*Id.*) In addition, Adams reported running out of all of his medications "due to flooding last month - was living at river, water carried away his [prescriptions]." (*Id.*) He had been taking his girlfriend's blood pressure medication intermittently. (*Id.*) Adams's medications were refilled, and an x-ray was ordered of his right wrist. (A.R. 435-36) The x-ray, taken the same day, showed a "healing intra-articular fracture of the distal radius"; normal carpal alignment; and some "[m]ild degenerative changes of the distal radioulnar joint" that were noted to be "stable." (A.R. 441)

Adams returned to see NP Lane on February 8, 2012, complaining of increased pain and decreased range of motion in his right wrist. He was referred to Orthopedics for further evaluation. (A.R. 437-38)

### B. Adams's Testimony

### 1. Hearing testimony

At the time of the ALJ hearing, Adams was living with his wife and a 22-year-old daughter in Salem, Oregon. (A.R. 42) He was born in 1966, making him 44 years old at the time of the hearing. He is 5'5" tall, and at that time weighed 150 pounds. (A.R. 43)

Adams was unsure what grade he finished in school, stating "maybe the fifth grade." (*Id.*) He does not have a GED. He got

-22-

"some vocational training stuff" when he was a teenager, but has no other training or education. (*Id.*) He stated he "can read a little but not a lot." (A.R. 44) He is able to read his name and some of his children's names, but not a newspaper. He cannot write because he "really can't spell at all." (*Id.*)

Adams stated he last had a wage-paying job in about 2000, when he worked "for a labor ready service out of Reno, Nevada." (A.R. 45) His only current income is food stamps. (*Id.*) He stated he is unable to work because of problems with his hands, and "severe headaches." (*Id.*) He has "no feeling" in his hands, causing "trouble hanging onto anything," and frequent dropping of objects. (A.R. 46) He is unable to lift anything over twenty pounds without dropping it. He can hold a coffee cup "for awhile," but drops it at least once a day on most days because of the lack of feeling in his hands. (A.R. 46-47, 51) When he tries to lie down for a nap, and for awhile after he gets up, his hands "will be real tingly and numb." (A.R. 51) He wore braces on his wrists that "worked for awhile," but after awhile, they stopped helping. (*Id.*) Adams stated he also has problems understanding and remembering instruc-tions. (A.R. 46)

Adams acknowledged that he used alcohol and methamphetamine extensively in the past, but stated he no longer uses them. He stopped drinking in about 2000, when he was diagnosed with "some kind of lead poisoning." (A.R. 47) At the time of the ALJ hearing, he had been clean and sober for three years. He went through a six-month outpatient substance abuse treatment program through his Indian tribe. (A.R. 47-48)

-23-

1    Adams stated he has "a terminal condition" resulting from
2    "some kind of paint poisoning that [he] received while working for
3    C-R Army Depot." (A.R. 48)  According to Adams, he, and others who
4    did the same work, had blood tests so doctors could determine the
5    amount of toxic material in their blood.  He stated he and two
6    others had "the most poisoning, and two of them have already
7    passed." (A.R. 48-49)  He filed a worker's compensation claim, but
8    stated his "lawyer did something," and he only ended up getting
9    $600, while "everybody else got 44,000." (A.R. 49)  Adams could
10   not remember the doctor's name who told him that his condition is
11   terminal.  He stated he attempted to get his records from Reno,
12   Nevada, but was told "the vault's closed or . . . there's some
13   reason they can't send [the] papers." (A.R. 49-50)

14   Adams indicated he had been trying marijuana for his headaches
15   "because the pills only go so far." (A.R. 50)  He stated marijuana
16   helps him sleep. (*Id.*)  He had a medical marijuana card at some
17   time in the past, and stated he had applied to get one again.[7]
18   (A.R. 54-55)  He stated his headaches are worst at the end of the
19   day, when he has "like a blinding, piercing pain to where [he]
20   wants to . . . lay down and pray for it to go away." (A.R. 50)  He
21   has severe headaches "at least five days out of the week." (*Id.*)
22   He also has headaches the other two days, but they are not as
23   severe. (*Id.*)

24   Adams stated he takes "three blood pressure pills, a pain
25   pill," and amitriptyline. (*Id.*)  His oxycodone dosage varies
26   depending on the severity of his headache.  He usually takes three

27   _____

28   [7]Medical records indicate that by July 6, 2011, at least,
     Adams had a "medical card" for marijuana. (A.R. 451)

-24-

1  or four pills a day, but if the headache is particularly severe, he
2  may take six or seven pills.   The pills make him very sleepy.
3  (A.R. 52)  He takes Cymbalta for his "anger issues."   (*Id.*)   He
4  stated he gets "really grumpy," and screams and yells at his wife.
5  (*Id.*)  He indicated if he had to "stand on a cannery bar all day,"
6  he would "be really upset" by the end of the day, "just from
7  standing there."  (A.R. 53)  He does not go out into the community
8  alone.  He may go to the park with his brother, or to the store or
9  a doctor's appointment with his wife, but he does not like being
10 around people.   He feels his headaches are not as bad if he just
11 stays home, doing nothing.  (*Id.*)

12      He and his wife sometimes go to church, if they have the gas
13 money.  Their daughter lives with them and does most of the house
14 cleaning, and about half of the cooking, with Adams's wife doing
15 the other half of the cooking.  Their daughter's boyfriend mows the
16 lawn.  Adams stated he sometimes will sweep the floor when he feels
17 able, and he takes out the garbage, but he is unable to mow the
18 lawn.  (A.R. 53-54)  He can put a TV dinner in the microwave, but
19 he has trouble reading instructions on boxes.  (A.R. 54)

20

21 **2.    *Written testimony***

22      On April 17, 2008, Adams completed a Pain Questionnaire
23 (apparently with his wife's assistance; *see* A.R. 57-58).
24 (A.R. 163-65)  He indicated he has headaches that are "pounding"
25 and "throbbing" in nature.   The headaches occur almost every day,
26 and he has headache pain most of the time.  He also has constant
27 pain in both wrists that is aching and burning in nature.  Any type
28 of activity increases his pain, and "nothing" makes the pain

better.  (A.R. 163)  He was taking Neurontin for his headaches and restless leg symptoms, but it was not working for his headache pain.  He was taking indomethacin (Indocin) for his wrist pain, but it was not helping and caused him stomach pain.  He planned to talk with his primary care provider about changing his medications. (A.R. 164)

Adams stated the amount of time he can be up and active before needing to rest "depends on [his] pain level" and the activity. (*Id.*)  He is unable to finish tasks that require use of his hands, and is unable to do much of anything during a headache. He used to enjoy riding his bike "all over," but can no longer do this activity.  (*Id.*)  He takes occasional walks and can walk "a ways" before resting if his head is "not pounding."  (A.R. 165)  He is able to groom himself, and cleans his apartment without assistance, but his wife helps him do the laundry once a week.  He occasionally goes out to visit friends, but someone else drives him.  His wife cooks for him, or he eats prepared or canned foods. (*Id.*)

Adams also completed an Alcohol and Drug Use Questionnaire, also on April 17, 2008.  He stated he had been sober for "one year + 28 days."  (A.R. 160)  Before getting clean and sober, he used to use methamphetamine and marijuana excessively.  (*Id.*)  He stated when he was using, he did not "eat right or clean up."  (A.R. 161)

### C.  Third-Party Evidence

### 1.  Stephanie Adams

#### a.  Written testimony

On April 17, 2008, Adams's wife Stephanie completed an Alcohol and Drug Use Questionnaire regarding Adams.  (A.R. 166-67)  She

1  stated Adams had been a long-time user of methamphetamine and
2  marijuana in the past, but he had been clean and sober for one
3  year.  She indicated when Adams was using drugs, he would not eat,
4  and he lost a great deal of weight.  He also would not care for
5  himself and his personal hygiene.  (*Id.*)

6      Also on April 17, 2008, Stephanie completed a Third-Party
7  Function Report regarding her husband.  (A.R. 152-59)  She
8  described Adams's daily activities as making coffee, smoking
9  cigarettes, showering three times a week, shaving when going
10 somewhere important, helping her shop for groceries, helping her
11 keep house as allowed by his wrist pain and headaches, watching
12 television, and complaining about his pain.  (A.R. 152)  She
13 indicated Adams lets their two dogs outside as needed.  His pain
14 sometimes makes it hard for him to sleep.  He has no problems with
15 personal care, and does not require reminders to take his medica-
16 tions.  (A.R. 153-54)  Stephanie does most of the cooking, with
17 Adams occasionally fixing hot dogs, microwave popcorn, or other
18 food that does not require cooking - "mostly snacking stuff." (A.R.
19 154)  when he is not in too much pain, he may spend "an hour or so"
20 helping with housework by picking up the living room, vacuuming,
21 and sweeping.  (*Id.*)  According to Stephanie, Adams does not drive
22 because he does not have a license.  He helps Stephanie shop for
23 food and household supplies three to four times a month.  He is
24 "not good at keeping records," and cannot handle a checkbook or
25 savings account, but he is able to count change and pay bills.
26 (A.R. 155)

27     Stephanie indicated her husband's primary activity is watching
28 television.  He spends most of his time with his wife and children.

1  He attends church once a week, if his wife accompanies him;
2  otherwise, he does not go.  (A.R. 156)  Stephanie stated Adams's
3  headaches make him irritable and grouchy, and he does not want to
4  be around people.  She stated Adams has severe carpal tunnel pain
5  that limits his ability to lift, reach, and use his hands.  His
6  headaches are made worse by bending and walking.  She stated Adams
7  has difficulty completing tasks, concentrating, understanding,
8  following instructions, and remembering things.  According to her,
9  Adams does not read well, and has to have most things read to him.
10 He sometimes can follow spoken instructions if his headache pain
11 "is not above a 6 on 1-10 scale."  (A.R. 157)  She stated Adams
12 does not handle stress or changes in routine very well.  He wears
13 splints on his wrists, but they do not always help.  (A.R. 158)
14 Stephanie remarked, "There are times when he almost is in tears
15 [be]cause he hurts so bad and doesn't know what to do to make it
16 stop.  He gets really angry and irritated easily when pain is
17 really elevated (most of the time)."  (A.R. 159)

18      Stephanie helped Adams complete a Function Report that is
19 consistent with the one she filled out herself.  (*See* A.R. 144-51)

20      Stephanie wrote a letter dated July 26, 2010, in which she
21 stated the following regarding Adams's functional limitations:

22           I live with my husband every day.  He
             drops things because sometimes he has no grip
23           or feeling in his hands and arms.  His arms
             and hands hurt often so bad that it hurts him
24           just to scratch my back.  His headaches are so
             bad that sometimes he walks around squinting
25           or just goes to bed.  When they are bad (which
             is often) he won't/can't eat, [and] therefore
26           he has lost weight.

27           Then there is his anger issues.  Most of
             which I think stem from his pain.  However, I
28           feel he has some mental anger issues as well.

                              -28-

1
2
3
4

> He is angry and irritable a lot.  Like 3/4ths
> of the time.  He has trouble concentrating and
> remembering things.  When [he] doesn't remem-
> ber what someone says he thinks he is right
> and gets angry.  I think the pain is the cause
> of the memory problems as it is so severe.

5  (A.R. 273)

6

7  **_b.    Hearing testimony_**

8      At the time of the ALJ hearing, Stephanie and her husband had
9  been married for "about two and a half years."  (A.R. 56)  They
10 were married to each other before, between 1986 and sometime in
11 1991, when they divorced.  They rarely had contact between 1991 and
12 2007, when they got back together.  (A.R. 56-57)

13     Stephanie has observed Adams having "a lot of difficulty with
14 concentration[, . . . and] difficulty understanding and compre-
15 hending things."  (A.R. 57)  She stated he can read smaller words,
16 but she has to explain "big" words.  (_Id._)  She helped her husband
17 fill out his Social Security paperwork because he did not under-
18 stand how to do it.  (A.R. 57-58)

19     Stephanie stated Adams sometimes is unable to eat because his
20 pain is so bad.  She stated, "He goes around the house holding his
21 head with his eyes like halfway closed and moaning around and
22 sometimes he'll just have to go lay down."  (A.R. 58)  According to
23 Stephanie, Adams's "real bad" headaches occur "two to four times a
24 week," and he is affected by headache pain "at least three-fourths
25 of the day."  (_Id._)  Regarding his wrist/arm problem, Stephanie
26 often sees Adams drop things like cigarettes, papers, and coffee.
27 (A.R. 58-59)

28

Stephanie stated her husband does not get along very well with people. She indicated Adams's "pain makes him very grouchy and irritable," especially with her. (A.R. 59) He loses patience with their grandchildren and does not do much with them because of his pain. (*Id.*) According to Stephanie, Adams's medications only help "a little," and they make him groggy and tired. The medications also dry out Adams's mouth, making his speech difficult to understand. (*Id.*)

According to Stephanie, Adams does not use methamphetamine, and has not since they remarried. She stated one requirement for her to remarry Adams was that he be clean for a year. She stated that at the time of the hearing, Adams had been off methamphetamine for three years. (A.R. 59-60) He does use marijuana "off and on." (A.R. 59)

## 2.  Jamie Colton

Jamie Colton, a friend of Adams's, wrote a letter dated August 2, 2010, stating he has known Adams for about 30 years, and has watched Adams's health deteriorate during that time. According to Colton, Adams has extreme, chronic pain that causes him to have anger flareups. Colton stated Adams's back pain, arm pain, and headaches, prevent Adams from doing much in the way of physical exertion. According to Colton, when Adams has a headache, he is unable to eat due to the pain. Colton offered his opinion that Adams is "disabled and has gotten progressively worse." (A.R. 274) He stated Adams is unable to work due to pain, and he needs financial support. (*Id.*)

-30-

### D.  *Vocational Expert's Testimony*

The VE agreed that although Adams has some work history, he has not earned enough to have any "past relevant work." (A.R. 62) The ALJ asked the VE to consider "a person who fits in the younger age category, a person with a marginal education and a person with some work in his background but nothing rising to the level of past relevant work." (A.R. 61-62)  The hypothetical individual would have "no exertional limitations whatsoever"; "no postural or manipulative or environmental limitations either"; "limited to unskilled work [involving] routine repetitive tasks with simple instructions"; and no performance of tasks requiring frequent interaction with members of the general public, but could have "occasional brief contact with the general public." (A.R. 63)

The VE stated the hypothetical individual would be able to perform work existing in significant numbers in the national economy.  The VE gave three examples: (1) "packager hand," described as "medium work, SVP 2[8], unskilled"; (2) "sweeper cleaner industrial, . . . medium work, SVP 2, unskilled"; and (3) "laborer laundry, . . . medium work, SVP 2, unskilled." (*Id.*)

---

[8]Jobs are classified with an "SVP," indicating the level of "specific vocational preparation" required to perform the job, according to the *Dictionary of Occupational Titles*.  The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or. Dec. 7, 2011) (Simon, J.) (citation omitted).  "The DOT identifies jobs with an SVP level of 1 or 2 as unskilled, jobs with an SVP of 3 or 4 as semi-skilled, and jobs with an SVP of 5 or higher as skilled." *Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

1    The ALJ asked the VE to consider the same person, but "assume
2  that he is essentially functionally illiterate, unable to read."
3  (A.R. 64)   Thus, the individual's "instructions for work tasks
4  would have to be explained to him verbally."  (*Id.*)  The VE
5  indicated that adding illiteracy to the individual's limitations
6  "would have no discernible impact" on the jobs he could perform.
7  (*Id.*)

8    Returning to the initial hypothetical, but adding some manipu-
9  lative limitations ("he can frequently handle, finger and feel")
10 "would rule out the [hand] packager because that requires con-
11 tinuous reaching, continuous handling and continuous fingering[,]"
12 but the manipulative limitations "would not rule out the sweeper
13 cleaner industrial and it would not rule out the laborer laundry."
14 (*Id.*)  If, instead, the individual could only handle, finger, and
15 feel occasionally, then both of those jobs would be eliminated, as
16 well. (A.R. 64-65)   However, the individual would be able to work
17 as a security guard, which is a light, semi-skilled job.  The VE
18 explained that the *Dictionary of Occupational Titles* ("*DOT*")
19 identifies the job of security guard as having an SVP of 3.
20 However, the VE stated the *DOT* was last updated in 1988, and more
21 recent publications from the Department of Labor and the State of
22 Oregon Employment Department specify "that the most significant
23 course of training for such work is 30 days or less which is tanta-
24 mount to SVP 2, unskilled work."  (A.R. 66)

25    The VE further stated a 1993 addendum to the *DOT* specifies
26 that a security guard job requires frequent handling, but the VE
27 disagreed with that.  The VE stated, "The basis of my disagreement
28 is conducting labor market surveys and doing job analyses for this

-32-

1   occupation.  In some cases for clients who have hand injuries and
2   hand limitations [sic].  I would characterize, based on that
3   experience, that the handling would be more in the occasional
4   range." (A.R. 66-67)  The VE could not explain why the 1993 publi-
5   cation identified the security guard job as requiring frequent
6   handling.  The VE summarized the duties of the job as "[b]asically
7   patrolling the grounds of a plant or a commercial establishment,
8   watching and reporting irregularities, observing surroundings,
9   contacting the police . . . and or the headquarters of the security
10  firm if something untoward is transpiring.  Keeping a very short
11  log of events that transpired that were unusual." (A.R. 68)

12      The VE stated he has had occasion to focus on the security
13  guard job in the past, including "for injured workers who had hand
14  injuries because unlike so many other jobs in the national or
15  regional economy, this job requires considerably less physical
16  demands relative to reaching, handling, fingering and feeling than
17  do most other jobs[,] particularly true at the unskilled level."
18  (A.R. 68-69)  The VE further explained that the *DOT* "lists maximum
19  requirements of occupations as generally performed[,] . . . [b]ut
20  that doesn't necessarily mean that that's the requirement that's
21  usually performed." (A.R. 69)

22      The VE indicated the individual also could work as a surveil-
23  lance systems monitor, an unskilled, sedentary job.  (A.R. 67)

24      Adams's attorney asked the VE to identify the reasoning, math,
25  and language requirements for the security guard and surveillance
26  systems monitor jobs, as specified in the *DOT*.  The VE stated the
27  security guard job "is a reasoning level of three, math level of
28  one, and a language level of two"; and the surveillance systems

-33-

1  monitor has a reasoning level of three, math level of one, and
2  language level of three.  (A.R. 70)  The VE indicated those levels
3  are consistent with his expectations of those two jobs.

4      The VE stated all of the jobs he had discussed, for all of the
5  hypothetical individuals, generally require an ordinary work
6  schedule, where the employee works two hours, has a fifteen-minute
7  break, works two more hours, has a longer lunch break, works two
8  hours, has another fifteen-minute break, and then works two more
9  hours before the end of the day.  He stated there might be "some
10 small deviation that would be allowed but that would need to be
11 verified."  (A.R. 70-71)  The VE indicated that, in general, absen-
12 teeism of more than one day per month, on an ongoing basis, "would
13 be likely considered excessive."  (A.R. 71)  He also stated a
14 supervisor's tolerance for "back talk . . . would be very minimal,"
15 and "in most competitive employment . . . simply not acceptable
16 behavior."  (A.R. 71-72)

### III.  DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.  Legal Standards

20      A claimant is disabled if he or she is unable to "engage in
21 any substantial gainful activity by reason of any medically
22 determinable physical or mental impairment which . . . has lasted
23 or can be expected to last for a continuous period of not less than
24 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

25      "Social Security Regulations set out a five-step sequential
26 process for determining whether an applicant is disabled within the
27 meaning of the Social Security Act."  *Keyser v. Commissioner*, 648
28

1  F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520[9]).  The

2  Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a
> substantially gainful activity?  (2) Is the
> claimant's impairment severe?  (3) Does the
> impairment meet or equal one of a list of
> specific impairments described in the regula-
> tions?  (4) Is the claimant able to perform
> any work that he or she has done in the past?
> and (5) Are there significant numbers of jobs
> in the national economy that the claimant can
> perform?

9  *Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094,

10  1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d

11  949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f)

12  and 416.920 (b)-(f)).  The claimant bears the burden of proof for

13  the first four steps in the process.  If the claimant fails to meet

14  the burden at any of those four steps, then the claimant is not

15  disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*,

16  482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119

17  (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth

18  general standards for evaluating disability), 404.1566 and 416.966

19  (describing "work which exists in the national economy"), and

20  416.960(c) (discussing how a claimant's vocational background

21  figures into the disability determination).

22      The Commissioner bears the burden of proof at step five of the

23  process, where the Commissioner must show the claimant can perform

24  other work that exists in significant numbers in the national

---

26      [9]Although *Keyser* dealt with an applicant for Disability
Insurance benefits under Title II of the Social Security Act, the
27  identical five-step sequential evaluation process is applied to
applications for SSI under Title XVI of the Act.  *Compare* 20 C.F.R.
28  § 404.1520 *with* 20 C.F.R. § 416.920.

1  economy, "taking into consideration the claimant's residual
2  functional capacity, age, education, and work experience." *Tackett*
3  *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner
4  fails meet this burden, then the claimant is disabled, but if the
5  Commissioner proves the claimant is able to perform other work
6  which exists in the national economy, then the claimant is not
7  disabled.  *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.
8  §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

9      The ALJ also determines the credibility of the claimant's
10  testimony regarding his or her symptoms:

11          In deciding whether to admit a claimant's
            subjective symptom testimony, the ALJ must
12          engage in a two-step analysis.  *Smolen v.*
            *Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
13          Under the first step prescribed by *Smolen*,
            . . . the claimant must produce objective
14          medical evidence of underlying "impairment,"
            and must show that the impairment, or a combi-
15          nation of impairments, "could reasonably be
            expected to produce pain or other symptoms."
16          *Id.* at 1281-82.  If this . . . test is satis-
            fied, and if the ALJ's credibility analysis of
17          the claimant's testimony shows no malingering,
            then the ALJ may reject the claimant's testi-
18          mony about severity of symptoms [only] with
            "specific findings stating clear and con-
19          vincing reasons for doing so."  *Id.* at 1284.

20  *Batson v. Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2004).

21

22              **B.  The ALJ's Decision**

23      The ALJ found Adams has not engaged in substantial gainful
24  activity since his application date of March 12, 2008.  He found
25  Adams has severe impairments consisting of "cognitive disorder not
26  otherwise specified; dysthymic disorder; and history of polysub-
27  stance abuse."  (A.R. 22)  He concluded that Adams "experiences

28

                        -36-

moderate limitations in concentration, persistence or pace due to his mental disorders." (*Id.*)

The ALJ found none of the physical impairments of which Adams complains would cause any more than minimal limitations in Adams's ability to perform basic work activities, and therefore, none of them is severe. (A.R. 22-23) The ALJ found the record evidence contains "no objective medical evidence of any acute findings or significant functional limitations relating to these conditions." (A.R. 22) Regarding Adams's carpal tunnel syndrome, the ALJ noted his peripheral nerve conduction studies were normal, and soon after that testing, Adams indicated he no longer needed the wrist braces. The ALJ further noted the disability investigator had observed that Adams "handled objects with ease and had no trouble grasping, shuffling or manipulating." (A.R. 22-23) The ALJ further noted Adams's head CT scan was normal; he "had full range of motion in his back, full 5/5 motor strength and normal sensory testing, gait and deep tendon reflexes"; and in June 2009, Adams reported doing well, with less intense headaches, and periods when he was almost free of pain without medications. (A.R. 23)

Regarding Adams's restless leg syndrome, the ALJ noted Adams had only been treated by nurse practitioners, who "are not acceptable medical sources" under the regulations. However, even if they were acceptable medical sources, the ALJ noted "their findings [were] based primarily on [Adams's] subjective complaints and [were] not substantiated by sufficient objective medical evidence." (*Id.*) The ALJ therefore found Adams's restless leg syndrome was "not medically determinable." (*Id.*)

1    The ALJ gave "no weight" to NP Bischoff's undated opinion
2  letter, finding the opinion "is not supported by any appropriate
3  medical findings and appears to be based largely on [Adams's]
4  subjective reports/allegations." (A.R. 24)  The ALJ further found
5  NP Bischoff's opinion to be inconsistent with notes from Adams's
6  physical examinations, and "entirely inconsistent with the opinions
7  of state agency medical consultants, Drs. Jensen and Alley, who
8  concluded that [Adams's] physical impairments are not severe and do
9  not result in any functional limitations." (*Id.*)  The ALJ gave
10  "significant weight" to the opinions of Drs. Jensen and Alley, both
11  of whom cited findings in the medical evidence indicating Adams's
12  physical conditions are not disabling.  (A.R. 23)

13    The ALJ noted there is no record evidence regarding Adams's
14  allegedly "'terminal' medical condition from exposure to a toxic
15  paint chemical while at a job in 2000," and the ALJ therefore found
16  "this alleged condition is not medically determinable." (A.R. 24)

17    The ALJ found Adams's impairments, singly or in combination,
18  do not meet or medically equal the criteria of any listed
19  impairment in the regulations, including Listings 12.02 (Organic
20  Mental Disorders); 12.04 (Affective Disorders); 12.05C (Mental
21  Retardation, specifically with "[a] valid verbal, performance, or
22  full scale IQ of 60 through 70 and a physical or other mental
23  impairment imposing an additional and significant work-related
24  limitation of function"; *see* A.R. 351); and 12.09 (Substance Addic-
25  tion Disorders).  (A.R. 24)  He found Adams has mild restriction in
26  his activities of daily living; no difficulties in social func-
27  tioning; moderate difficulties with regard to concentration,
28

1  persistence, or pace; and no extended episodes of decompensation.
2  (A.R. 24-25)

3      The ALJ discussed listing 12.05C further, because at the close
4  of the hearing, Adams's attorney specifically asked the ALJ "to
5  give consideration to listing 12.05(C)." (A.R. 72) Adams's
6  attorney stated, "If one couples the IQ scores that the
7  psychologist, Doctor Dietland [sic], considered to be the result of
8  good effort, with any of these other significant vocational
9  impairments, there could be a listing here." (*Id.*) The ALJ found
10 "no evidence of onset before [Adams] turned age 22, as required by
11 the listing." (A.R. 25) Further, although the ALJ noted
12 Dr. Dietlein's finding that Adams has "significant cognitive limi-
13 tations," the ALJ further noted the doctor "did not diagnose
14 [Adams] as being mentally retarded." (*Id.*) The ALJ also noted
15 that the investigator's report indicated Adams "presented as func-
16 tional," and appeared "perhaps uneducated but not retarded or
17 lacking in cognitive functioning." (*Id.*) The ALJ further found,
18 "Moreover, the record indicates that [Adams] used drugs heavily
19 from age 15 until 2007, which I find has likely contributed to his
20 cognitive limitations." (*Id.*; exhibit citation omitted).

21     The ALJ found Adams has "the residual functional capacity to
22 perform a full range of work at all exertional levels but with the
23 following nonexertional limitations: [he] is able to perform
24 unskilled work (routine, repetitive tasks with simple instructions)
25 with occasional, brief contact with the general public; and [he]
26 should be given verbal instructions for work tasks." (A.R. 26)
27 The ALJ found Adams's allegations "regarding his alleged
28 impairments and limited activities are not fully credible." (A.R.

27)   The ALJ relied heavily on the investigator's report, noting Adams told the investigator "he had applied for several jobs, which is not consistent with being disabled from working or being only able to do minimal activities of daily living, as he alleged." (*Id.*)  He noted the investigator indicated Adams demonstrated the ability to read through his list of prior employers, exhibited good long-term and short-term memory, tracked the conversation without difficulty, demonstrated good vocabulary, and "was sober, alert, talkative, personable and socially appropriate." (*Id.*)  The ALJ noted Adams's presentation to the investigator differed signifi-cantly from his presentation to Dr. Dietlein.  Together with the other record evidence, and the state agency psychologists' opinions, the ALJ found Adams's allegations regarding his limited functional abilities were not credible.  He indicated Adams's "exaggerations and/or inconsistencies regarding his limitations call into question [Adams's] credibility and indicate that his allegations of disability are suspect.  In addition, [his] allega-tions that he has a 'terminal' medical condition due to paint exposure are undocumented and unconvincing." (*Id.*)

With regard to Adams's mental functional abilities, in par-ticular, the ALJ noted Adams has had very little treatment other than taking an anti-depressant prescribed by his primary care physician or a nurse practitioner.  Adams has not been in any type of regular counseling or psychotherapy, and psychological testing indicates he can perform unskilled work and engage in social interactions successfully.  The ALJ gave "significant weight" to Dr. Dietlein's opinion, which was based on Adams's "overall performance on intelligence testing[.]" (A.R. 28)  The ALJ noted

Dr. Dietlein had found Adams's IQ to be low, and indicated Adams would have problems sustaining concentration and attention, but the doctor further found Adams's "memory is largely intact, and . . . he exhibited the ability to persist in 'what was asked of him,' as well as 'engage in social interactions successfully.'" (*Id.*; citation omitted)  The ALJ found Dr. Dietlein's assessment supportive of the ALJ's conclusion that Adams "is capable of performing unskilled work involving routine, repetitive tasks with simple, verbal instructions and occasional, brief interaction with the general public."  (A.R. 28-29)  The ALJ also gave significant weight to the opinions of Drs. Anderson and Kennemer, both of whom opined Adams would be able to understand, remember, and carry out simple, routine tasks, and have occasional contact with the general public.  (A.R. 29)

The ALJ found Stephanie Adams's testimony mirrored Adams's allegations regarding his limitations, and therefore, her statements were not entirely credible for the same reasons Adams's allegations were not fully credible.  (*Id.*)

The ALJ relied on the VE's testimony in finding Adams is capable of performing jobs that exist in significant numbers in the national economy.  The ALJ cited four jobs discussed by the VE as jobs Adams could perform; i.e., packager, hand; sweeper, cleaner; laborer, laundry; and guard, security.  The ALJ found the VE had provided a reasonable explanation for the discrepancy between the VE's opinion of the skill rating for the security guard position (SVP 2), and the skill level listed in the *DOT* (SVP 3).  (A.R. 30-31)  Because the ALJ found Adams is able to work, he concluded Adams had not been under a disability at any time from the date of

1  his application (March 12, 2008), through the date of the ALJ's
2  decision (September 3, 2010).   (A.R. 31)

3

4                    **IV.   STANDARD OF REVIEW**

5       The court may set aside a denial of benefits only if the
6  Commissioner's findings are "'not supported by substantial evidence
7  or [are] based on legal error.'"   *Bray v. Comm'r of Soc. Sec.*
8  *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*
9  *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*
10 *V. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1
11 (9th Cir. May 20, 2011).   Substantial evidence is '"more than a
12 mere scintilla but less than a preponderance; it is such relevant
13 evidence as a reasonable mind might accept as adequate to support
14 a conclusion.'"   *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
15 1039 (9th Cir. 1995)).

16      The court "cannot affirm the Commissioner's decision 'simply
17 by isolating a specific quantum of supporting evidence.'"   *Holohan*
18 *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*
19 *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).   Instead, the court
20 must consider the entire record, weighing both the evidence that
21 supports the Commissioner's conclusions, and the evidence that
22 detracts from those conclusions.   *Id.* However, if the evidence as
23 a whole can support more than one rational interpretation, the
24 ALJ's decision must be upheld; the court may not substitute its
25 judgment for the ALJ's.   *Bray*, 554 F.3d at 1222 (citing *Massachi v.*
26 *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

27 / / /

28 / / /

                              -42-

1                          *V.   DISCUSSION*

2        Adams argues the ALJ erred in failing to find him disabled,

3   listing numerous ways in which he claims the ALJ erred.  Dkt. #19,

4   p. 5.[10]  Only two of the issues Adams raises are discussed here, the

5   first for purposes of procedural clarity, and the second because it

6   is dispositive of the case.

7

8              *A.   Adjudication of Prior Application*

9        Adams argues the ALJ erred in failing to adjudicate his prior

10  application, "first denied November 20, 2007."  Dkt. #19, p. 17;

11  *see* A.R. 125 (showing initial denial on 11/20/2007).  Adams asserts

12  that a prior determination may be reopened for any reason within

13  twelve months of the initial notice of denial.  *Id.* (citing 20

14  C.F.R. § 416.1488(a)).  He argues that because his denial was less

15  than twelve months prior to the March 12, 2008, filing date of his

16  current  application,  and  because  the  ALJ  acknowledged  Adams's

17  request to reopen the prior decision, the ALJ erred in failing to

18  adjudicate Adams's prior application.  *Id.*

19       The parties agree that, in general, the Commissioner's refusal

20  to reopen a prior decision is not subject to judicial review.  *Id.*;

21  Dkt. #21, p. 18; *see Klemm v. Astrue*, 543 F.3d 1139, 1144 (9th Cir.

22  2008) ("Because a denial of a motion to reopen is a discretionary

23  decision, it is not final and, thus, is not generally reviewable by

24  a  district  court.")  (citations  omitted);  42  U.S.C.  §  405(g)

25

26       [10]Page citations to the parties' briefs refer to the pagination
    applied by the court's electronic filing system, rather than to the
27  page numbers entered by the parties on their briefs.  *See, e.g.,*
    Dkt. #19, where the plaintiffs' brief shows "Page 1," but the ECF
28  system shows "Page 5 of 36."

                              -43-

1  (district courts have jurisdiction to review only "final decisions"
2  of the Commissioner); *see also Anderson v. Astrue*, 2010 WL 4365767,
3  at **2-3 (D. Or. Aug. 19, 2010) (Clarke, MJ) (discussing the four-
4  step administrative process an applicant must complete in order to
5  receive a final, reviewable decision).  The parties also agree that
6  an exception to this general rule exists "where the Commissioner
7  considers 'on the merits' the issue of the claimant's disability
8  during the already-adjudicated period."  *Lester v. Chater*, 81 F.3d
9  821, 827 n.3 (9th Cir. 1995) (citation omitted); *see* Dkt. #19, p.
10 17; Dkt. #21, pp. 18-19.  "Where such a *de facto* reopening occurs,
11 the Commissioner's decision as to the prior period is subject to
12 judicial review."  *Lester, supra*.

13      The ALJ stated, at the beginning of the hearing, "And I note
14 that you have in writing requested that a previous application be
15 re-opened so I will include that in my decision making process."
16 (A.R. 41)  Adams argues, "Here there was no refusal to reopen, but
17 rather a failure to finish the promise.  The ALJ's promise is a
18 reopening, and the prior application requires due process con-
19 sideration."  Dkt. #19, p. 17.  The Commissioner argues the ALJ's
20 statement "only indicated that the ALJ would consider the reopening
21 request."  Dkt. #21, p. 19.

22      It was not clear from the ALJ's statement whether he meant to
23 convey that he would consider the request to reopen, or the prior
24 application itself.  However, it is apparent from the ALJ's deci-
25 sion that he intended the former, and although he did not expressly
26 so state, the ALJ denied Adams's request to review the prior
27 denial.  This is clear from the time period encompassed by the
28 ALJ's ruling.  Rather than ruling on whether Adams was disabled

1   from his alleged disability onset date of March 31, 2007, which
2   would have included the already-adjudicated period, the ALJ limited
3   his ruling to the period from the date of Adams's current applica-
4   tion, March 12, 2008.   (*See* A.R. 20-31)   Thus, the ALJ did not
5   "consider[] 'on the merits' the issue of the claimant's disability
6   during the already-adjudicated period."   *Lester*, 81 F.3d at 827
7   n.3.   The denial of Adams's request to reopen the prior decision is
8   not subject to judicial review.   *See Klemm, supra*.

10                    **B.   Listing 12.05C**

11        Adams argues the ALJ erred in failing to find him disabled
12   under listing 12.05C.   Dkt. #19, pp. 22.   The Commissioner argues
13   the ALJ did not err "because the record does not show the onset of
14   cognitive disorder before the age of 22."   Dkt. #21, p. 4; *see id.*,
15   pp. 4-8.

16        For Adams to show he is disabled under listing 12.05C, he must
17   show that his impairment meets all of the following criteria:

18              12.05  Mental retardation: Mental retardation
                refers to significantly subaverage general
19              intellectual functioning with deficits in
                adaptive functioning initially manifested
20              during the developmental period; i.e., the
                evidence demonstrates or supports onset of the
21              impairment before age 22.

22              The required level of severity for this
                disorder is met when the requirements in A, B,
23              C, or D are satisfied.

24              *    *    *

25              C.  A valid verbal, performance, or full scale
                IQ of 60 through 70 and a physical or other
26              mental impairment imposing an additional and
                significant work-related limitation of func-
27              tion[.]

28   20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C ("listing 12.05C").

                              -45-

1    The ALJ gave four reasons for his finding that Adams's
2 impairment does not meet listing 12.05C:

> [E]ven though I do not find that [Adams's]
> impairments include mental retardation, I have
> considered whether [his] cognitive impairment
> meets medical listing 12.05C for mental retar-
> dation. Although [Adams's] representative
> asserted that [Adams] meets listing 12.05C
> based on his IQ score, I find that [Adams's]
> cognitive disorder does not meet 12.05C
> because **[1]** there is no evidence of onset
> before he turned age 22, as required by the
> listing. **[2]** Dr. Dietlein's report indicates
> that [Adams] does have significant cognitive
> limitations; however, Dr. Dietlein did not
> diagnose [Adams] as being mentally retarded.
> **[3]** In addition, the [investigative] report
> indicates that [Adams's] level of cognitive
> functioning is much higher than exhibited with
> Dr. Dietlein ("cognitively speaking [Adams]
> presented as functional;" "he gave the impres-
> sion of someone [who] was perhaps uneducated
> but not retarded or lacking in cognitive func-
> tioning"). **[4]** Moreover, the record indicates
> that [Adams] used drugs heavily from age 15
> until 2007, which I find has likely con-
> tributed to his cognitive limitations.

16 (A.R. 25; citations to exhibits omitted)

17    Regarding the ALJ's first two reasons - that the record lacks
18 evidence showing Adams's impairment began before age 22, and
19 Dr. Dietlein did not diagnose Adam as being mentally retarded -
20 Adams argues the ALJ failed to consider "the Oregon Youth Authority
21 records documenting Adams'[s] academic and behavioral challenges
22 before age 22." Dkt. #19, p. 19. Adams argues the ALJ's failure
23 to address this evidence was an error of law. *Id.* n.3. In
24 addition, Adams argues no formal diagnosis of mental retardation is
25 required to meet the regulatory requirements. *Id.*, p. 18.

26    Adams relies, in particular, on *Brooks v. Astrue*, 2012 WL
27 4739533 (D. Or. Oct. 3, 2012) (Simon, J.). In that case, the
28 claimant Brooks argued the ALJ erred in finding he did not meet

-46-

listing 12.05C.  Brooks offered evidence of two IQ tests, administered when he was 47 and 50 years of age.  The earlier test results indicated Brooks had a Verbal IQ of 61, a performance IQ of 60, and a full-scale IQ of 58.  The later test results indicated Brooks had a Verbal IQ of 67, a performance IQ of 72, and a full-scale IQ of 66.  A medical expert at the ALJ hearing testified the results of both IQ tests were valid.  Brooks also offered his high school transcript, showing that he failed most of his classes.  The ALJ found the IQ tests did not establish that Brooks had a cognitive impairment prior to age 22.  "Further, the ALJ rejected using Mr. Brooks'[s] transcript as substitute evidence because the 'records did not include standardized test results or explain the basis for the low grades.'"  *Brooks*, 2012 WL 4739533, at *4.

Judge Simon held the plain language of the regulations demonstrates that a claimant "may meet the listing without a formal diagnosis of mental retardation." *Id.*, at *5 (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 1200, which provides "the claimant must only 'satisfy[] the diagnostic description in the introductory paragraph' in addition to the C criteria.").  Judge Simon noted that although the Ninth Circuit has yet to address the issue, "other circuits and district courts within the Ninth Circuit have presumed that a valid adult IQ score is evidence that the impairment existed during the claimant's developmental period." *Id.* (citing cases from the 4th and 11th Circuits, and the Eastern District of California).  Judge Simon joined Judges Hernandez and Marsh from this court in holding "a valid adult IQ score can be reflective of an impairment that manifested during the claimant's developmental period." *Id.*, at *6 (citations omitted).  Judge

1  Simon further noted "the language of the Listing supports the use
2  of circumstantial evidence, acquired after the end of a claimant's
3  developmental period, to satisfy the diagnostic requirements of the
4  listing." *Id.* (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05:
5  "'[T]he evidence demonstrates *or supports* onset of the impairment
6  before age 22.'" Emphasis added.).

7      The IQ test administered to Adams by Dr. Dietlein yielded a
8  Verbal IQ of 64, Performance IQ of 69, and Full Scale IQ of 63.
9  Dr. Dietlein made no finding concerning the validity of the scores,
10 but noted Adams "appeared to put a good effort forth[.]"  (A.R.
11 310)  The Commissioner indicates Dr. Dietlein "did not diagnose
12 mental retardation, nor was he able to determine whether [Adams]
13 had a learning disorder, deficits in adaptive functioning, or
14 subaverage intellectual functioning as a child." Dkt. #21, p. 6
15 (citing A.R. 312).  The doctor did state, however, based on his
16 findings, "it is plausible that Mr. Adams may have had ADHD as a
17 child with tandem learning disabilities. His cognitive limitations
18 in tandem with his reported chemical exposure may have compromised
19 what may have been previous poor cognitive functioning."  (A.R.
20 312)

21     The records provided by the Oregon Youth Authority's MacLaren
22 School for Boys, and Marion County Family Court Service records,
23 provide evidence that Adams did, indeed, have "previous poor
24 cognitive functioning."  The records date from April 24, 1979, to
25 May 13, 1983, the period when Adams was 13 to 17 years of age, and
26 reflect the following facts.  In April 1979, Adams was in the sixth
27 grade, and was making mostly Cs and Ds.  (A.R. 211)  Adams had very
28 poor attendance, did not complete his homework assignments, had

-48-

1  poor communication skills, and exhibited behavior problems.
2  According to Adams's mother, his attitude, motivation, and behavior
3  had deteriorated following the death of his father. (A.R. 211-15)
4  The school wanted to test Adams to see if he should be put into a
5  special education program, but Adams did not want to participate in
6  the testing, and his mother "[b]owed to her son's wishes." (A.R.
7  216; *see* A.R. 213-14)  In October 1980, a counselor opined that
8  Adams likely would "not do much beyond getting a GED and being
9  involved in some type of job." (A.R. 217)

10      On October 3, 1980, when Adams was in seventh grade at "Court
11 School," to which he had been ordered as a result of a juvenile
12 conviction, his teacher estimated that Adams's "basic skill level
13 [was] at about the 3rd grade [level]." (A.R. 225)  Notes indicate
14 Adams had "just learned the months of the year and their order," as
15 well as "the days of the week and how to spell them," in late
16 September 1980. (A.R. 226)  He was "working on addition in math."
17 (*Id.*)  He was required to keep a journal, and his journal entries
18 were printed, not written in cursive.  Adams wrote, "I Like school
19 it is Fun.  I Like to talk.  I Like to go home.  I See a dog."
20 (*Id.*)  Adams told his teacher that he had never been in special
21 education classes.  The teacher observed, "I can understand . . .
22 why he'd skip school if he wasn't in special classes - especially
23 because he seems very embarrassed by his low skills.  He doesn't
24 ask for help and keeps a low profile.  [Adams] reads orally pretty
25 smoothly but is lacking in comprehension skills." (*Id.*)

26      In November 1980, Adams was noted to be "doing very well" at
27 the Court School, as far as his attendance and behavior.  The
28 school wanted to test Adams "because his developmental level

-49-

1  seem[ed] to be below what it should be." However, the counselor
2  had been unable to contact Adams's mother regarding the proposed
3  testing, despite repeated attempts to do so. (A.R. 220; *see* A.R.
4  218-20)

5      In the next progress note, dated December 3, 1980, Adams's
6  teacher indicated Adams's "skills academically have not increased
7  much in 90 days. . . . He completes assignments with difficulty,
8  and is functioning at about a 3rd grade level." (A.R. 227) The
9  next month, his teacher noted Adams "completes assignments with
10 difficulty at about a 3rd grade level (working at a 4th grade
11 level, with one-on-one instruction)." (A.R. 228) Adams had prob-
12 lems with skipping school, and sleeping during class, and he
13 generally kept to himself. His teacher and counselor indicated
14 Adams had problems with inadequate supervision at home. (A.R. 226-
15 31)

16     When Adams entered the MacLaren School, in April 1981, the
17 intake counselor recommended Adams "be involved in a remedial
18 school program." (A.R. 234-35) As of June 9, 1981, his grades
19 were as follows: Driver's Education - C; Math Lab - D; Language Lab
20 - B; Physical Education - B; Social Studies - C; Shop - C. His
21 performance in the math lab was noted to be "poor," on average.
22 (A.R. 237) One month later, his Social Studies grade had dropped
23 to a D. He was noted to be wasting time, failing to complete
24 assignments, and having attitude and cooperation problems in Math
25 Lab and Social Studies. In Language Lab, he was "doing fine," and
26 "progressing." (A.R. 238) By August 20, 1981, Adams was making an
27 F in Math Lab, not keeping up with his written work, violating the
28 rules of his residential cottage, exhibiting lack of motivation,

and not participating in group activities. (A.R. 239) By October 6, 1981, notes indicate Adams seemed to be "making [a] downhill slide," and seemed to have "quit trying." (A.R. 241) He still was failing to complete his written assignments. (*Id.*) A case review dated November 3, 1981, indicates Adams had "continued to go downhill." (A.R. 243) He had been caught smoking marijuana, resulting in a reduction in privileges. His behavior was "poor to acceptable." (*Id.*) His current grades were Shop - C+; Physical Education - C; Language Lab - B; Reading Lab - C; Social Studies - C; and Math Lab - "R."[11] (*Id.*) In December 1981, Adams's attitude and behavior had improved somewhat, but his performance in school remained poor. (A.R. 244)

A progress report and case review dated February 10, 1982, indicated Adams continued to have difficulties with his motivation and attitude, disregard for cottage rules, and certain negative behaviors. His current grades were Art - C-; Shop - C+; Physical Education - "Passing"; Math - C-; Math Lab - "R-"; Reading Lab - B; and Language Lab - C+. "Comments from his teachers were that his performance and behavior were average and above, with the exception of Math. Lab, where his performance was poor." (A.R. 247) Adams was "paroled to his mother and stepfather on 2-12-82," at age 16. (A.R. 248) He enrolled in high school, but almost immediately began skipping school, and using drugs. (A.R. 248-49) He was returned to MacLaren School due to parole violations, and had ongoing problems with absconding and behavior. (*See* A.R. 252-61) A case review dated January 11, 1983, indicates Adams's grades

[11]The records do not indicate the meaning of an "R" grade.

1  were: Art - C; Shop - C; Physical Education - B; Math Lab - "R
2  (C-)", Language Lab - B; Reading Lab - B; and Basic Reading - D.
3  (A.R. 262)

4       The Commissioner argues "this evidence was not probative or
5  significant," and "provide[d] little insight into deficits in
6  [Adams's] adaptive functioning or significantly subaverage intel-
7  lectual functioning." Dkt. #21, pp. 7, 8.  The Commissioner claims
8  these records show that most of Adams's problems "stem[med] from an
9  unstable home life . . . manifest[ing] in criminal behavior and
10 poor school attendance," rather than subaverage intelligence. *Id.*,
11 p. 7.  The court disagrees that this evidence lacks significance.
12 The records show, for example, that Adams only learned the months
13 of the year and their correct order, and the days of the week and
14 their spellings, at age 14.  At age 15, testing indicated he was
15 functioning at level 4.3 in Reading; 2.4 in Math; 3.4 in Language;
16 and 5.7 in Spelling.  (A.R. 252)  The evidence indicates these
17 cognitive deficits were evident well before Adams reportedly began
18 abusing drugs (the ALJ's fourth reason for failing to find Adams
19 met listing 12.05C), and provide substantial circumstantial evi-
20 dence that "supports onset of the impairment before age 22," as
21 required by the regulations.

22      Considering these records from Adams's adolescence, his
23 extremely low IQ scores as determined by Dr. Dietlein's testing,
24 and Dr. Dietlein's observations of Adams and opinions regarding
25 Adams's impaired cognitive functioning, the court is convinced that
26 Adams's cognitive impairment manifested during his developmental
27 period.  The court finds it was error for the ALJ to ignore the
28 school and court records. *See* 20 C.F.R. pt. 404, subpt. P, app. 1

1  § 1200(D) ("In addition [to medical evidence], we will consider
2  information you provide from other sources when we determine how
3  the established impairment(s) affect your ability to function.  We
4  will consider all relevant evidence in your case record.").

5      As a third reason for finding Adams's impairment did not meet
6  listing 12.05C, the ALJ cited the investigative report, which the
7  ALJ found indicated Adams's "level of cognitive functioning is much
8  higher than exhibited with Dr. Dietlein." (A.R. 25)  The investi-
9  gator's observations were largely consistent with Dr. Dietlein's
10 regarding Adams's ability to carry on a conversation, and engage in
11 successful social interactions.  However, the investigator's obser-
12 vations did nothing to discount Dr. Dietlein's objective testing.
13 Dr. Dietlein noted the test results indicated Adams has "signi-
14 ficant problems" with his "ability to attend to verbally presented
15 information, to process information in memory and then to formulate
16 a response"; "significant problems performing basic mental arith-
17 metic"; and an "inadequate" ability to think abstractly.  (A.R.
18 311)  These observations are consistent with notations appearing
19 throughout Adams's school records.

20     This is not a case where, for example, a claimant asserts he
21 is unable to walk, but an investigator observes him walking, or a
22 claimant testifies he cannot lift over 10 pounds, but an investi-
23 gator observes him carrying a toddler.  There is no indication that
24 the disability investigator in this case had any particular
25 training or experience in recognizing or diagnosing mental dis-
26 orders or cognitive deficits.  His observations are insufficient to
27 undermine the results of the objective IQ testing, and the opinions
28 of a trained psychologist, particularly where the test results

appear to be consistent with the other evidence of record. Dr. Dietlein is an "acceptable medical source" under the regulations, and his opinion is entitled to "more weight than the brief observations documented by the non-treating, non-examining, non-medical disability investigator[]." *Lubin v. Comm'r*, 507 Fed. Appx. 709, 711 (9th Cir. 2013) (citing 20 C.F.R. §§ 404.1527 and 416.927, which provide that "the opinion of an acceptable medical source is given more weight than that of non-medical sources, as defined in 20 C.F.R. 404.1513(d), 416.913(d)").

The court finds Adams has met the introductory requirement to show his impairment began before age 22, and the first requirement of listing 12.05C, requiring an IQ of 60 through 70. However, that does not end the inquiry. To satisfy the requirements of listing 12.05C, Adams also must show that he has "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Listing 12.05C. "This require-ment is satisfied when an additional impairment's 'effect on a claimant's ability to perform basic work activities is more than slight or minimal.'" *Brooks*, 2012 WL 4739533, at *8 (quoting *Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1987) (citations omitted)). In other words, if the ALJ finds a claimant "has another severe impairment at step two, then the requirement is satisfied." *Id.* (citing cases so holding).

Here, the ALJ found "another severe impairment at step two." *Id.* He found Adams has severe impairments including "cognitive disorder not otherwise specified; dysthymic disorder; and history of polysubstance abuse." (A.R. 22) The ALJ further found "[t]he medical evidence indicates [Adams] has limitations in his capacity

-54-

to perform basic work activities due to" these impairments; speci-
fically, "moderate limitations in concentration, persistence or
pace." (*Id.*)  As a result, Adams's mental impairment also meets
the requirement that he have an "other mental impairment imposing
an additional and significant work-related imitation of function."
Listing 12.05C.

Substantial evidence in the record indicates Adams's mental
impairment meets all of the criteria of Listing 12.05C.  The record
lacks substantial evidence to support the ALJ's contrary conclu-
sion.  Adams, therefore, should have been found disabled at step
three of the sequential evaluation process.  *See* 20 C.F.R.
§ 416.920(d) (claimant whose impairments meet or equal a listed
impairment will be found "disabled without considering [the
claimant's] age, education, and work experience"); *Sullivan v.
Zebley*, 493 U.S. 521, 532-33, 110 S. Ct. 885, 892, 107 L. Ed. 2d
967 (1990) ("[T]he listings were designed to operate as a presump-
tion of disability that makes further inquiry unnecessary.  That
is, if an adult is not actually working and his impairment matches
or is equivalent to a listed impairment, he is presumed unable to
work and is awarded benefits without a determination whether he
actually can perform his own prior work or other work."); *Tackett*,
180 F.3d at 1098 (if claimant's impairment meets or equals a listed
impairment, then "the claimant is '*disabled*' and therefore entitled
to . . . benefits").

## VI.  CONCLUSION

The court has the power to enter a judgment affirming, modi-
fying, or reversing the Commissioner's decision, with or without

remand for further proceedings. 42 U.S.C. § 405(g). The court has "discretion to remand a case either for additional evidence and findings or to award benefits." *Smolen*, 80 F.3d at 1292 (citation omitted). If the record has been fully developed and further administrative proceedings would not serve any useful purpose, then the court may direct an immediate award of benefits. *Id.*

Here, no further proceedings are necessary. The record contains substantial evidence that Adams's mental impairment meets the requirements of listing 12.05C, and he therefore is disabled. Accordingly, the undersigned recommends the Commissioner's decision be **reversed**, and this case be remanded for payment of benefits.

### VII. SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due by **September 6, 2013.** If no objections are filed, then the Findings and Recommendations will go under advisement on that date. If objections are filed, then any response is due by **September 23, 2013.** By the earlier of the response due date or the date a response is filed, the Findings and Recommendations will go under advisement.

IT IS SO ORDERED.

Dated this 19th day of August, 2013.

/s/ Dennis J. Hubel

_____

Dennis James Hubel
Unites States Magistrate Judge

-56-